ELEANOR JANE CAREY, appellant, v. ROLLAND R. DRAKE, appellee; HELEN DRAKE, individually and as trustee under last will and testament of W. N. DRAKE, deceased. (Defendant defaulted against below not a party to this appeal.)

No. 47722.

(Reported in 44 N.W.2d 357)

OCTOBER 17, 1950.

REHEARING DENIED DECEMBER 18, 1950.

Cutting & Cutting, of Decorah, for appellant.

Houck & Miller, of Decorah, for appellee.

MULRONEY, J.—Eleanor Jane Carey, formerly Eleanor Jane Drake, filed suit against her brother Rolland Drake and her sister Helen Drake, wherein she sought to set aside a deed she had

made to Rolland on the ground of fraud. The deed was to a one-fourth interest, approximately, in a Winneshiek County farm which Eleanor had inherited from her father. Since the trial court held the evidence was insufficient to establish the fraud, and since we hold otherwise, it will be necessary to state the record at some length.

These are the facts as we find them from a record which shows surprisingly little conflict in the testimony: Eleanor was the youngest of five children of W. N. Drake of Burlington, Iowa. Her two brothers, Leland (Roy) and Rolland (Rod), were more than twenty years old when she was born and her two sisters, Marjorie and Helen, were nineteen and sixteen years, respectively, older than she was. The family lived in Burlington where W. N. Drake was the bookkeeper in a hardware store. When Eleanor was about ten years old her mother died and about three years later W. N. Drake broke up his home in Burlington and retired. Eleanor was sent to her sister Marjorie, who was married and living in St. Louis. She lived with Marjorie for about six months and then went to Chicago where she lived with Helen in an apartment. Helen, who was unmarried, worked and supported Eleanor while Eleanor went through high school in Chicago. It is firmly established in the record that the relationship between Helen and Eleanor was more of a mother-and-daughter relationship rather than sisterly. When Eleanor finished high school she got a job and paid Helen half of her wages for two and a half years to repay Helen for what she had done for her.

Meanwhile their father had gone to live with Rolland who appears not to have been married at the time his father retired. (The record shows he was married several times.) At this time the father owned about a one-fourth interest in a farm in Winneshiek County which he had inherited from his father and which brought him in an income of about $300 or $350 a year. In July of 1942, Rolland and his father lived in an apartment in La Salle, Illinois. The father often visited Helen and Eleanor in their apartment in Chicago. He had a bank account in Decorah and at this time he owned a one-fourth interest in the livestock on the Winneshiek County farm.

In September of 1942, W. N. Drake had a stroke and was taken to the hospital, where he died December 1, 1942. The funeral was in Burlington and all of the children came to Burlington and were present in Rolland's hotel room when the will of W. N. Drake was produced. It seems that it was pretty generally known by the children that their father's will left everything to Eleanor. Leland, the oldest child, read the will. It was dated February 5, 1937, and in it the testator bequeathed all of his real and personal property to Helen as trustee for Eleanor until Eleanor became twenty-one years of age, at which time the property was to be turned over to Eleanor "to be hers forever." In the will the testator stated:

"I desire to make it plain that I bear the same love and affection towards all of my children, but I have given my property to my daughter, Eleanor Jane, because I feel my other children are in a position to take care of themselves and for the further reason that I have given each of them his or her share of my property during my lifetime."

The reading of the will caused an argument among the children and especially between the boys. Helen testified that Rolland was "upset" over the will; that "he was dissatisfied"; that he had words and argument with his older brother and said "that was not the way Dad intended it to be." She said that Rolland finally ordered them all out of the room. Eleanor testified:

"My oldest brother Roy opened and read the will. Rolland said he thought the will should be torn up and the farm given to him because he cared for Daddy. Any argument there took place between Roy and Rod. Roy stated that if the will were torn up he thought we all five should take a share of it. Rod didn't like this. No one asked me to what I should have. I understood the terms of the will pretty much. I think it was on my mind for a few minutes that they were arguing over property belonging to me. I don't recall I said anything at all in this family conversation. I don't believe I said anything as to my own personal rights. I was too embarrassed. I was with brothers and sisters."

Rolland remembered he had an argument with his brother when the will was read. He said he could not remember any statements to the effect that the will should be torn up, but it is possible they were made.

Eleanor testified that as Rolland ordered them out of the room he said he did not want to see any of them again until "they could see things his way." All of the children were staying at the same hotel in Burlington and Eleanor said that the next morning she received a letter from Rolland addressed to her and to Marjorie and Roy. She said that the letter was torn up by Marjorie because "Marjorie was so mortified that our family should fuss that way." She said that in the letter Rolland "stated in four to eight pages of stationery that he wanted to have nothing to do with any of us until we could see things his way. He wanted the farm." Neither Marjorie nor Roy testified in the trial but Rolland testified:

"I don't recall writing and leaving a letter from me to Roy, Marjorie and Eleanor that I was not going to talk with them until they saw it my way but if they said I did, I probably did. I have had quite a few dreams about that Drake farm. For quite a few years past I have always thought I would like to have that (the Drake farm) for my own. Who wouldn't? * * * I think that the feelings between myself and the other members of the family were rather strained at that time."

When Helen left Burlington she took the will with her. She traveled with Rolland to La Salle and she said Rolland told her that her father's interest in the Drake farm was not worth anything and mentioned his plan of having Eleanor deed over the property to him. A few days later she went on to Chicago where she joined Eleanor in the apartment. She and Eleanor talked of Rolland's demands that Eleanor deed the farm to him, and Helen told her not to do it—not to give in to Rolland "under any circumstances." On March 16, 1943, Eleanor went to Fort Sill, Oklahoma, to work and while there she lived with Marjorie and her husband. Rolland wrote to her there about deeding the property over to him and Marjorie and her husband told her not to do it. Eleanor became twenty-one on June 30, 1943.

Sometime in July 1943 Rolland wrote to Helen in Chicago and offered her $1500 out of the farm income if she would get Eleanor to deed the one-fourth share in the Winneshiek County farm to him. She agreed and came to La Salle, Illinois, to meet Rolland in his lawyer's office on the 25th day of July, 1943. The lawyer had prepared a trust deed to the one-fourth interest in the farm for her to sign, as trustee, deeding the property to Eleanor. She had not filed the will for probate and Eleanor was then twenty-one years old but the lawyer thought it would be safer to execute this deed before having Eleanor deed the property to Rolland. The lawyer had also prepared another deed for Eleanor to sign deeding the property to Rolland, which deed Helen took with her and she sent this deed to Eleanor in Fort Sill with instructions for her to sign. Eleanor did not sign the deed then. Marjorie and her husband were still telling her not to sign.

Finally, after holding the will for nearly a year, Helen received some advice that she should file the will for probate. She sent the will to Decorah where it was filed for probate in the Winneshiek County District Court on September 24, 1943, by a Burlington attorney with whom Helen corresponded. Now follows a most amazing record of the administration of the estate by Helen, who was either a faithless or an incompetent executrix. On the same day the will was filed Rolland filed objections to the probate of the will on the ground that his father was mentally incompetent at the time the will was executed (in 1937) and the will was the result of influence of third parties. The filed objections consist of about a dozen lines and show no attorney appearing for Rolland. The objections were false and Rolland knew they were false when he filed them. He testified in this trial that there never was anything the matter with his father's mind up until his stroke in September 1942 and that he did not know anything about anyone ever influencing his father in connection with the will.

Nothing was done about these objections by the proponent, Helen. She was in the employ of Rolland charged with the job of getting Eleanor, who she testified was as her child to her, to deed over the farm interest to Rolland. The objections filed

by Rolland were nothing more than a club to batter down Eleanor's resistance to his demands that she sign the deed to him.

In the latter part of February 1944, Marjorie and her husband went to visit Rolland, leaving Eleanor in Fort Sill. When they returned they changed their tune. Now they told Eleanor to sign the deed. She was held up as being the stubborn kid sister who was causing a big family fight by being obstinate. Additional pressure was brought on Eleanor by Rolland in the form of a claim he would assert if the will was allowed probate. It was represented to Eleanor by Rolland that this claim would exhaust the estate. Rolland offered her $500 if she would sign, and half of the income for three years, and told her the farm interest was worthless—although he testified in this case the farm interest was worth $4200 at the time his father died. Finally she signed the deed on March 4, 1944, and Rolland withdrew his objections and the will was admitted to probate, but Rolland and Helen were not through taking their young sister's property.

Helen says she did not know what personal property was. She never advised her attorney that there was any personal property in the estate. She merely took over the father's bank account in Decorah and added to the bank account the sums she received as farm rental or the sale of her father's personal property and disbursed from this account in payment of the funeral and administration expenses. She said she did what Rolland told her to do. She even collected $900 on a life insurance policy of her father's, payable to Eleanor, and she said she received this in cash and disbursed this out to all of the children who had contributed to their father's hospital bill. When she got through parceling out the insurance money to the other children (herself and Rolland included) there was only $150 left for Eleanor from the insurance proceeds. She said she could not remember how much Rolland received from the insurance fund. She said the insurance fund disbursement was with Eleanor's permission, but Eleanor stated she was given to understand the insurance was to reimburse the other children for advancements and that the insurance "was then taken out to pay funeral expenses." It is clear from Helen's testimony that Eleanor's interests in this insurance were never explained to her.

In June of 1944 Rolland wrote to Helen about his claim against the estate, which he stated was money expended by him, and insisted that she pay his claim from the Decorah bank account immediately. The claim was in the sum of $165 and he itemized it to show that it was for services for three attorneys he had hired in connection with the drawing of the deeds and his objections to probate of the will and his own traveling expenses for the trip to Decorah in connection with the filing of his objections to probate. Helen paid his claim first and then obeyed his instructions as to the division of the balance, which was about $792.42. As per his instructions she sent Rolland a check for $264.22 and she paid herself and Eleanor $264.10 each.

Later all of the livestock on the farm was sold. Rolland demanded and got the full one-fourth share of the proceeds of this sale, or $700. When Helen apparently remonstrated about this Rolland wrote her an abusive and threatening letter and insisted that she write to their aunt (a co-owner who held the sale proceeds) and instruct her to turn the full share over to him. He also wrote to Eleanor warning her of the dire consequences that would follow if she joined Helen in her "scheme" to get these proceeds. His weak explanation of his conduct was that he thought he got all of Eleanor's property when he got the deed.

Many of his letters are in the record. They show that he is an intelligent man. He had two or three years of college education. His letters and his actions show beyond a shadow of a doubt the consummated plan to swindle his sister out of her rightful inheritance. Even his threat of a claim against the estate which would exhaust the estate, and which was never filed, was a fraud. He testified his claim would be in the sum of $4000, but about the time he was thinking of filing a claim he wrote his uncle about his claim for his father's keep and itemized the claim in the letter and said it would be "in the neighborhood" of $2500. The $500 which he paid Eleanor was only a fraction of the money he wrongfully obtained from her. The record shows that Helen and Eleanor were completely under his dominion and control. Eleanor testified: "I was afraid of Rolland * * *. It was his bullying attitude. * * * I hated to cross him * * * I hated to cross any of the family. * * * they were laying the blame of the family feud on my shoulders."

Helen testified she was getting her advice as to the handling of the personal property from Rolland; that he had great influence over her; and that she "abided" by his advice.

At first Rolland denied that he had agreed to give Helen $1500 if she would get Eleanor to sign the deed. When faced with one of his own letters where he told his uncle he had agreed to give Helen $1500 if she would get Eleanor to sign the deed he said it might be an error and maybe it should have been $150. He then admitted it and excused his conduct by saying he wanted to see Helen get something for all she had done for Eleanor. This pious motive was also exploded when he was shown another of his letters to Helen where he tried to welsh out of the deal by saying that she, Helen, had failed to put the deal across and that it was Marjorie who had finally gotten the job done by getting Eleanor to sign.

I. We need not bother with the question of whether or not the record supports a finding of constructive fraud on the ground that Rolland occupied a superior position in the family relationship over Eleanor, and was therefore bound to act in good faith and with due regard to her interests. There was ample evidence of actual positive fraud. In testing the evidence to see whether actual fraud was established the family relationship can be considered as a circumstance. 37 C. J. S., Fraud, section 2. By our failure to consider the question of constructive fraud we do not mean to infer this record would be insufficient to cast on Rolland the burden of proving affirmatively that the transfer was in compliance with equitable requisites. We merely prefer to base our conclusion on the affirmative proof of actual fraud.

II. Seldom have courts attempted to give a definition of "fraud" with the thought that it would cover all cases. They have usually been content to enumerate (in varying numbers) the elements that go to make up fraud and if they are all clearly established by the evidence then the plea of fraud has been established. In Hootman v. Beatty, 228 Iowa 591, 598, 293 N.W. 32, 35, we stated the essential elements of fraud were: "(1) false representation, (2) materiality, (3) scienter, (4) intent to deceive, (5) reliance, (6) resulting injury in damage."

A mere reading of this record shows the above elements were all clearly established. We need not go over the evidence again and point to portions as establishing each separate element. Rolland took full advantage of the fact that he was twenty years older than Eleanor. He exploited his "older brother knows best" position, after his father died, to satisfy his own greed. From the very day the will was read every move he made was calculated to make Eleanor appear detestably selfish before the other children as if Eleanor was somehow at fault because the father had given his property to her. We do not know how much the father gave to the other children in his lifetime but the will was drawn at the time the father retired and it states that testator had given them each their share. There is testimony that when Rolland was out of a job he and his wife and child lived off of his father's bounty for a few years and he said he could not remember writing a letter to his father that he owed him more than he could ever repay, but he would not deny he had written such a letter. We know the father had done little for Eleanor in a material way and his wish to provide for this child of his later years by giving to her his modest estate was perfectly understandable. His wishes were thwarted by the fraud of his son Rolland. Every move this middle-aged man made was, by his own story, false and done with intent to cheat his young sister so that his dream of someday owning the "Drake" farm could be realized. He bribed the executrix whom his father had trusted to carry out the terms of his will and who admittedly stood in the position of mother to this motherless girl. He was willing to blast the memory of his father by filing false objections to the probate of his father's will in his desperate effort to force his young sister to bow to his terms, and the crowning fraud: he made her pay for all of his legal expenses and trouble he was put to in connection with cheating her out of her property and falsely objecting to the will. He represented to her that the property was worth nothing but testified it was worth $4200. Helen, as executrix, listed it in her inventory as worth $4325. There was other testimony that it was worth as much as six or eight thousand dollars. There is no question but that Eleanor relied upon and trusted Rolland and Helen. They seem to be

the only two children that she knew intimately as she was growing up. As stated, Rolland and his wife and son lived in the father's home for a few years after Eleanor's mother died. He was, as she said, her "big brother" and she trusted him and acceded to his judgment. That she suffered damage by reason of his fraud is too apparent for words. He stripped her of her inheritance and made her pay for the trouble and expense he incurred while defrauding her. The five-hundred-dollar consideration which he gave for the deed was money which Rolland, with the help of his hireling executrix, embezzled from the estate that was rightfully Eleanor's.

In this action plaintiff seeks restoration of but a part of the property of which she was defrauded, namely the real estate. That relief is now granted and her deed to Rolland of the interest in the farm that she inherited from her father is to be canceled and set aside.

The cause is reversed with instructions that a decree for the plaintiff canceling the above deed and quieting the title in plaintiff as against any claims of the defendants be entered.— Reversed.

All JUSTICES concur.